# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TIMOTHY J. LEWIS,

        Plaintiff,

        v.                                Case No. 12-C-1204

BAY INDUSTRIES, INC.,
AWS/gb/ CORP., and
SCHMIDT ACQUISITION 114 INC.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SANCTIONS

Plaintiff Timothy Lewis brought this action against his former employer Bay Industries, Inc. (Bay) alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 and wrongful discharge contrary to Wisconsin law. Lewis has also named as defendants AWS/gb Corporation, Bay's parent company, and Schmidt Acquisition 114, Inc., an entity identified as Lewis's employer on payroll and tax documentation. (Am. Compl. ¶¶ 3–4, ECF No. 7.) Lewis treats all entities collectively as his employer, and to simplify matters, all three defendants will be referred to collectively as "Bay."

On November 1, 2013, Bay filed a motion for summary judgment. (ECF No. 22.) This was one day after Lewis filed a motion to compel seeking further information concerning Bay's response to his request for production of emails and other electronically stored information (ESI). The parties agreed to work out their differences and the Court stayed the deadline for Lewis' response to Bay's summary judgment motion until 14 days after the discovery was provided. Lewis withdrew the

motion to compel on January 23, 2014. (ECF No. 43.)

Briefing on the motion for summary judgment was finally completed on April 23, 2014. On June 5, 2014, Lewis filed a motion for a stay of a decision on the summary judgment motion until after the Court decided a motion for sanctions against Bay for deleting emails and spoliation of evidence that Lewis intended to file. Unable to determine from the record then before it whether Lewis' proposed motion had merit, the Court agreed to hold off deciding the pending summary judgment motion until after Lewis filed his motion for sanctions. Now, having considered the matter in its entirety, I conclude that Bay's motion for summary judgment will be granted and Lewis's motion for sanctions denied.

## I. Background

Bay Industries, Inc., headquartered in Green Bay, is a family-run company primarily involved in the business of selling building materials. (Defs' Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 29.) The company was founded by Arnold Schmidt and his wife in the 1970s, and Arnold served as President and CEO until October 2010 when his son Dan succeeded him. (*Id.* ¶ 9.) Bay hired Lewis, a certified public accountant, in May of 1997. (Lewis Decl. ¶ 1, ECF No. 58-1.)

Lewis contends that in early 2010, likely between January and March, Bay employee Kyla King informed him that she was hearing rumors about herself from others in the company. (DPFOF ¶ 78.) King, formerly a receptionist, had recently been promoted to the position of Travel Manager. In this position, King's job was to manage the newly-created Travel Department and coordinate travel for Bay's sales associates. (*Id.* ¶¶ 63–66.) Some administrative employees who had worked at Bay longer than King resented the promotion and spread rumors about King. (*Id.* ¶ 72.) The

rumors consisted of tales that King would sit in Arnold Schmidt's chair with her feet upon his desk, that she and Arnold had engaged in sex in his office, and that a newly purchased car she drove to work was purchased by Arnold. (*Id.* ¶ 79.) Some employees likened King to a former employee named Rose Jacobs, who in the past had also been rumored to have had an affair with Arnold Schmidt and to have received expensive gifts from him. (Decl. of Dawn Goddard ¶¶ 16, 21, ECF No. 58-10.) King also reported to Lewis that a manager named Tim Pendley had on one occasion pulled on her ponytail and told her he intended to list her name in his cellphone contacts as "Stupid." (DPFOF ¶¶ 96–97.) Lewis subsequently informed Arnold Schmidt of the rumors. (*Id.* ¶ 85.) He also reported the hair pulling incident to Dan Schmidt. (D. Schmidt Dep. at 31:20–25, ECF No. 49-2.) Pendley claimed to have been acting in a playful manner, and Dan Schmidt took him at his word that he had not intended his comments or behavior in a sexual way. (*Id.* at 32:4–11.)

In June 2010, Lewis e-mailed Arnold and Dan Schmidt concerning his belief that Human Resource Manager Carrie Mueller's failures as the HR Manager were exposing the company to potential claims by disgruntled employees. (*Id.* ¶ 103.) He also stated he did not believe that either of them would want to be deposed about the "inappropriate and unethical" conduct that Mueller was allowing to exist. (*Id.* ¶ 104.) Lewis met with Arnold Schmidt again on July 13, 2010, and reiterated that he would testify truthfully if he were ever deposed. (*Id.* ¶ 109.)

In July 2013, King attempted to quiet the rumors by sending an email to General Manager Mike McClain, Human Resources Director Carrie Mueller, Dave Smits, and Arnold and Dan Schmidt. The email contained documents showing that she had purchased her own car, and it stated that King hoped the documents would "quell any and all rumors" that were being "created, spread,

or commented upon" by the "above listed people" [email recipients] about her new car.  (*Id.* ¶ 89.) Shortly after King sent the email, Dan Schmidt responded to King with a terse email calling her "pathetic" and an "insecure child" and informing her that she was "hated by everyone."  King went to Lewis' office visibly upset and showed him a copy of the e-mail.  (Lewis Decl. ¶ 5.)

Between August 3 and August 5, 2010, Lewis e-mailed Dan Schmidt and asked him to further investigate whether the hair pulling incident was "hostile," as opposed to "playful," as Pendley had previously characterized the incident.  (Lewis Decl. ¶ 34, Ex. 5.)  Lewis also met with Arnold and Dan Schmidt in early August 2010 and again expressed concerns over the company's human resource practices.  Lewis reiterated that if he were ever deposed "about any legal issue relating to the company" he would testify truthfully.  Arnold and Dan Schmidt told Lewis they expected him to testify truthfully should he ever be called upon to answer questions.  (DPFOF ¶¶ 112–13.)  Arnold Schmidt ultimately decided to dissolve the Travel Department, which left King without a position in the company.  Bay offered her a $250,000 severance package, and she accepted the offer.  In doing so, she agreed to "destroy and render irretrievable all electronic communications . . . in her possession."  (King Severance Agreement ¶ 8, ECF No. 49-8.)

Dan Schmidt succeeded Arnold as President and CEO on October 13, 2010.  In the fall of 2010, Dan informed Arnold that he was considering eliminating Lewis's position, and Arnold recommended that he not take that action.  (*Id.* ¶¶ 123–24.)  Dan initially heeded his father's advice, but approximately six months later, Dan made the decision to eliminate Lewis's position.  (*Id.* ¶¶ 130, 135.)  Dan Schmidt contends he eliminated the position as a cost-saving move in response to an economic downturn.  (D. Schmidt Decl. ¶ 21, ECF No. 25.)  Bay offered Lewis a $200,000

severance package, but he declined the offer and ultimately filed this action.  (D. Schmidt Decl. ¶ 29.)

## II. Summary Judgment Methodology

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "An affidavit or declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see also Visser v. Packer Eng'g Assocs, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (observing that "personal knowledge" may include factual inferences and opinions, so long as the inferences and opinions are "grounded in observation or other first-hand personal experience.  They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.").  "Material" means that the factual dispute must be outcome-determinative under the law.  *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir. 1997).  A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party has the burden of showing there are no facts to support the nonmoving party's claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In determining whether summary judgment is proper, a court must construe the evidence in the light most favorable to the non-moving party.  *Ramos v. City of Chicago,* 716 F.3d 1013, 1014 (7th Cir. 2013). There is no

genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor. *Smith v. Lafayette Bank & Trust Co.,* 674 F.3d 655, 657 (7th Cir. 2012).

### III. Analysis

Lewis claims his discharge was pretextual and that he was actually terminated for opposing the sexual harassment of King, in violation of Title VII's anti-retaliation provision. Additionally, he claims his termination was wrongful under Wisconsin law because in his meetings with Arnold and Dan Schmidt, he told them he would testify truthfully if ever questioned about certain tax and antitrust matters that he believed could expose Bay to liability. Before addressing the merits, the Court will address Bay's motion to strike the declarations of Tim Lewis and Dawn Goddard. (ECF No. 54.)

Bay moves to strike these declarations because it contends they fail to satisfy the requirements of 28 U.S.C. § 1746(2)[1], which provides that unsworn declarations must follow substantially the following form: "I declare . . . under penalty of perjury that the foregoing is true and correct. Executed on (date)." The Lewis and Goddard declarations initially filed with Lewis's summary judgment response contain only "[Name] deposes and states as follows." (ECF Nos. 47 & 48.) In response, Lewis filed a motion for leave to file new declarations that change the language to "I, [Name], depose and state the following is true and based on personal knowledge." The declarations also indicate that they are "signed under penalty of perjury." (ECF Nos. 58-1 & 58-10.)

---

[1]Although Bay references § 1746(1), the provision applicable to declarations executed outside the United States, the Court construes it to reference § 1746(2), the provision applicable to declarations executed within the United States.

Bay opposes this motion because it asserts that Lewis has not demonstrated "excusable neglect" for his delay in filing declarations that comply with § 1746. Federal Rule of Civil Procedure 6(b)(1) gives courts discretion in most situations to forgive missed deadlines by reason of "excusable neglect." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006).

The Court concludes that the "excusable neglect" analysis does not apply here, as Lewis's failure was not a failure to comply with the Federal Rules of Civil Procedure. Bay moved to strike Lewis's affidavits as insufficient to support the facts asserted therein, and under Fed. R. Civ. P. 56(e), "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may (1) give an opportunity to properly support or address the fact. . . ." The Court concludes that granting Lewis's motion for leave to file the supplemental declarations is appropriate, as striking the declarations would be an unduly harsh sanction. In any event, Bay has suffered no prejudice, as its ability to respond to Lewis's arguments has not been hindered. The initial and supplemental declarations are identical in substance, and Lewis's action in procuring the supplemental declarations was reasonably prompt under the circumstances. Lewis's motion for leave to file the supplemental declarations will be granted, and the Clerk is directed to detach and file the declarations at ECF Nos. 58-1 and 58-10.

Bay further contends that portions of the Lewis and Goddard declarations should be stricken because they contain inadmissible hearsay. Under this Court's local rules, motions to strike portions of declarations provided for purposes of summary judgment are disfavored. *See* Civil L. R. 56(b)(9) ("Whenever possible, all arguments relating to the other party's submissions should be contained in memoranda."). Bay's motion to strike portions of the declarations will be summarily denied, although the Court will consider the admissibility of the parties' evidence, when appropriate, in the

course of its analysis. *See* Fed. R. Civ. P. 56(c)(4). These preliminary issues resolved, I now proceed to address the merits of Lewis's claims.

## A. Retaliation under Title VII

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). An employee may prove a retaliatory discharge under the direct or indirect method. *Orton-Bell v. Indiana*, No. 13-1235, —F.3d—, 2014 WL 3566338, at *4 (7th Cir. July 21, 2014). The direct method requires the plaintiff to show: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Under the indirect method, the plaintiff establishes a prima facie case if he demonstrates that he (1) engaged in statutorily protected activity; (2) was meeting the employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012). Thus, the starting point under each method is determining whether Lewis engaged in protected activity.

### 1. Lewis did not engage in protected activity.

Sexual harassment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"

- 8 -

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998)). The plaintiff must show that the conduct at issue constituted discrimination *because of* his or her sex. *See Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). As the Court explained in *Oncale*, "Title VII is not a general civility code," and the statute "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." 523 U.S. at 81. The statute also does not reach "expressions of animosity or juvenile provocation" that are not based on sex. *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997).

Similarly, an employee's complaint of harassment constitutes a protected activity only if the complaint indicates that "the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.*; *see Gleason*, 119 F.3d at 1147 (holding that plaintiff's general complaints about supervisor's management style did not constitute protected activity). An employee's complaints may constitute protected activity even if the challenged conduct or practice does not actually violate Title VII, provided the employee had a reasonable and good faith belief that it did. *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994).

The parties dispute whether Lewis's reports to Arnold and Dan Schmidt of the harassment suffered by King constitute protected activity. Bay asserts that the incidents King reported to

Lewis—rumors about a sexual affair and the hair pulling incident—do not invoke the protections of Title VII because they were not incidents of harassment based on King's gender. Bay contends employees expressed animus towards King not because she was female but because they doubted the legitimacy of her promotion and disapproved of her handling of the Travel Department. Bay also argues that Arnold Schmidt, a male, was equally a subject of the affair rumors and that the hair-pulling incident was not sexual in nature.

Lewis asserts that when he made the reports, he genuinely believed that the harassment directed at King was based on her gender. He asserts he "believed the hostile and severe conduct directed toward Ms. King . . . would not have been directed toward a male had a male been leading the travel department or been thought to have had an affair." (Lewis Decl. ¶ 30, ECF No. 58-1.) He believes the hair pulling incident also would not have happened if King were male. (*Id.* ¶ 35.) Lewis further contends his belief was objectively reasonable because the conduct at issue met the definition of sexual harassment in Bay's anti-discrimination policy. The policy stated that "[e]xamples of sexual harassment include, but are not limited to . . . [i]nnuendos, suggestive comments, sexually oriented 'kidding,' jokes about gender specific traits, or foul or obscene language or gestures . . . [and] [u]nwelcome and unnecessary physical contact, such as patting, pinching, or brushing against another's body." Lewis also claims the harassment "involved statements and conduct of a similar nature to that alleged in a prior Title VII/Retaliation lawsuit filed against Daniel Schmidt and Defendants." (Pl's Resp. Br. at 35, ECF No. 45.) Lewis recalls that a former employee alleged Daniel had addressed her as "sweetheart," subjected her to crude remarks, and failed to treat her with the same level of respect and professionalism afforded male employees. (Pl.'s Resp. Br. at 31, ECF No. 45.)

Lewis's Title VII claim fails because his belief that the harassment suffered by King was based on her gender was objectively unreasonable. In *Pasqua v. Metro. Life Ins. Co.*, the plaintiff Pasqua, a recently promoted male branch manager, was informed by Vukanic, a female sales representative, of office rumors that the two had an intimate relationship. 101 F.3d 514, 515 (7th Cir. 1996). Rumors also circulated that Pasqua was showing favoritism to Vukanic. *Id.* at 516. Pasqua reported the rumors to his superiors, and shortly thereafter he was demoted and reassigned. *Id.* Pasqua filed suit against his MetLife under Title VII, claiming he had been subject to sex discrimination in having to work in a hostile or abusive environment, and that he was demoted in retaliation for complaining about the rumors. *Id.* The district court granted the defendant's motion for summary judgment, and the Seventh Circuit affirmed. In affirming the district court's decision, the Seventh Circuit first noted that "[h]arassment that is inflicted without regard to gender, that is, where males and females in the same setting do not receive disparate treatment, is not actionable because the harassment is not based on sex." *Id.* at 517. Pasqua's claim that he was subjected to sexual harassment failed, the Court then concluded, because he failed to establish that the alleged harassment was based on sex:

> There is not even a hint in the record that any rumors or vulgar statements concerning an illicit relationship between Pasqua and Vukanic were made *because* Pasqua was a male. By the very nature of such gossip, *both* Pasqua and Vukanic were made the subject matter as is evidenced by Vukanic being the first to utter a threat to sue over the matter. Moreover, both men and women alike were talebearers. Such rumors spread, irrespective of the truth, for any number of reasons having nothing to do with gender discrimination. In addition to what commonly motivates gossip of this type—a fascination with the prurient—perceptions of favoritism on Pasqua's part added fuel to the fire in this case. Although it is not inconceivable that someone might spread slanderous rumors in the workplace for the simple motivation that someone else was of a particular gender, this case, however, is not one of those rarities.

*Id.* at 517. Pasqua's claim falls short, the Court held, because he failed to establish "the elementary requirement in this circuit that the alleged harassment was based upon the plaintiff's sex."

The Court then turned to Pasqua's retaliation claim. To satisfy the first element of that claim, Pasqua had to prove he had a "reasonable belief" that a Title VII violation occurred when he first complained to the employer about the rumors. The district court had concluded that Pasqua met this element because "he believed that the rumors and accusations amounted to sexual harassment as to Vukanic." *Id.* at 518. The Court of Appeals, however, held that Pasqua's belief was irrelevant: " Pasqua's subjective beliefs are irrelevant. Pasqua was required to establish that he had a reasonable belief that the rumors amounted to harassment based upon sex." *Id.* "Again," the Court noted, "there is not a trace of evidence in the record that the rumors circulating throughout the NHBO and other MetLife offices were motivated by any disparate consideration of either Pasqua or Vukanic's gender."

*Pasqua* is instructive here because the rumors about King and Arnold Schmidt were rumors that they had a sexual affair and that Schmidt displayed favoritism towards King. Lewis argues that although King and Arnold Schmidt were both subjects of the affair rumors, "wildly disproportionate hostilities" were directed at King as a female. (Pl.'s Resp. Br. at 37, ECF No. 45.) He asserts that no one addressed Schmidt in demeaning terms, as Daniel Schmidt did to King when he called her an "insecure child," "pathetic," and "hated by everyone," and no one negatively compared Arnold Schmidt to another male, as employees compared King to Rose Jacobs.

The simple answer to this, of course, is that Arnold Schmidt was the owner of the company. It made no sense to suggest that he had obtained a position he did not deserve through unfair means. That was in essence the substance of the rumors King was complaining about—that she had

obtained a position she did not merit because of her relationship with the boss. The individuals who held these views, moreover, were the administrative staff members who had worked for the company longer than King, many of whom were women, and the sales personnel who relied on the Travel Department for arranging their business travel.

In other words, there is no evidence that the rumors and hostility directed toward King were levied at her *because of* her sex. The rumors and complaints were based on the belief, whether true or not, that King had been unfairly given a position she was not qualified to perform. Daniel Schmidt berated King because he thought she was accusing him of spreading rumors about her, and the words he used, although wildly inappropriate, were not sex-specific terms. Additionally, the fact that no one compared Arnold Schmidt to another male is inconsequential, as Arnold was accused of being the male having affairs with both King and Jacobs. It may be true that King suffered more insults than Arnold Schmidt, but King and Arnold Schmidt were not similarly situated employees—as noted above, Arnold Schmidt ran the company, and it is unsurprising that no one teased or insulted him in connection with the rumors. In short, the evidence suggests that when Lewis complained about the affairs to Dan and Arnold Schmidt, he could reasonably have believed that King had been bullied and harassed, but he could not have reasonably believed that King was subjected to discrimination on the basis of her sex. As in *Pasqua*, no reasonable jury could find that Lewis's comments about rumors of an alleged affair constituted protected activity.

The Court reaches the same conclusion with respect to the hair touching incident, as Title VII does not cover every incident of unwanted touching in the workplace. In *Adusimilli v. City of Chicago*, the Seventh Circuit rejected a hostile work environment claim because the plaintiff complained of no more than teasing about waving at squad cars, ambiguous comments about

bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four

isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks." 164 F.3d

353, 361. The court further noted that

> the most serious misconduct, the unwanted touching of Adusumilli's buttocks, took the relatively mild form of a poke and occurred only once. It is well established in this Circuit that there is a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex."

*Id.* at 362 (quoting *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1168 (7th

Cir. 1996)).

Although the conduct underlying a plaintiff's complaint need not be actionable, the conduct

at issue here, is too far removed from actionable sexual harassment to support a "reasonable belief"

in harassment based on sex. The conduct Lewis complained about was Tim Pendley telling King

he would list her name in his phone as "Stupid" and later pulling her hair. (Lewis Decl. ¶ 23, ECF

No. 58-1.) This was a single incident of unwanted touching, and there is no evidence that the

touching was sexual in nature. In fact, Lewis does not explicitly state that King characterized the

incident in sexual terms. His "understanding in hearing Ms. King's complaints was that she

certainly did not view the hair-pulling as playful, and it was unwelcome conduct that scared her."

(Lewis Decl. ¶ 26.) Lewis also asserts that when King spoke to him about the affair rumors and the

hair pulling incident, he perceived that "[t]he conduct towards [King] was at times physical and

threatening in nature." (*Id.* ¶ 24.) In reporting the incidents to Arnold and Dan Schmidt, Lewis

characterized the conduct as "harassment" and "bullying," but did not use words like "sexual

harassment." (*Id.* ¶ 31.) But "unwelcome," "hostile," and "bullying" conduct does not necessarily

relate to a person's sex. If Pendley had punched King in the arm instead of pulling her hair, that

may have been unwelcome and hostile touching, but it would have had nothing to do with her sex. The fact that King's hair was involved does not automatically make the act a sexual one, and considering Pendley's "Stupid" remark, the context suggests that the hair pulling incident was just another act of juvenile provocation.

Lewis relies on *Holland v. Jefferson Nat. Life Ins. Co.*, a case in which the plaintiff alleged she had been subjected to adverse employment decisions in retaliation for complaining about two sexually offensive remarks made by a co-worker. 883 F.2d 1307, 1308 (7th Cir. 1989). The Seventh Circuit concluded that although the acts of harassment complained of may not have been sufficiently "severe or pervasive" to be independently actionable under Title VII, the plaintiff reasonably believed that the harassing conduct "was in violation of the law." *Id.* at 1315. In *Holland*, however, it was clear that the harassing conduct was based on sex. The plaintiff had complained that her co-worker scrawled "Big Boobs" under the caption "Physical Demands" on a rough draft of the plaintiff's job description. *Id.* at 1309. This differs markedly from the type of harassment underpinning Lewis's complaints, and *Holland* thus does not control here.

Lewis additionally points to e-mails sent by executives that purportedly disparage King because of her sex. (*See* Pl's Resp. Br. at 8–11.) For example, in e-mails to Arnold Schmidt, McLain referred to King as a "Queen Bee," stated that King sees the facts through "the narrow perspective of a young and extremely ambitious young woman, and suggested that she used "uncontrollable sobbing" to get her way. Dan Schmidt also e-mailed Arnold Schmidt: "Amazing how one girl, who is younger than my daughter Kristy, is more important than . . . everyone else in the company[.]" There is no evidence that Lewis or King ever saw these e-mails prior to the discovery phase of this lawsuit. Thus, they were not known to Lewis at the time he made his complaints and cannot be the basis for his "reasonable

- 15 -

belief" that King suffered sexual harassment.

In sum, Lewis has not proffered evidence from which a reasonable jury could find that he engaged in protected activity under Title VII. The incidents he reported were isolated instances of workplace conduct, but no jury could find that he reasonably believed they constituted sex-based harassment. An employee cannot simply shout sexual harassment to his supervisors and thereby insulate himself from adverse job actions by his employer. Lewis' Title VII retaliation claim therefore fails as a matter of law. For this reason alone, Lewis' Title VII claim fails.

## B. Wrongful Discharge

Lewis contends he was also terminated for asserting that he would testify truthfully about wage, tax, and antitrust matters. He alleges that Bay executives engaged in three improper activities: (1) in approximately 1997, they sent payments to the wife of Mark Maloof, a Bay employee who was convicted of price fixing, for the purpose of influencing him in his criminal proceedings regarding his work for Bay; (2) in 2007, General Manager McLain sent an email to three executives, including Lewis, that appeared to reflect price-fixing by Bay with its vendors; and (3) over the course of 17 years, Bay paid Arnold Schmidt's son Randy substantial sums of money and recorded it as wages even though Randy did no work for the company. Lewis asserts that these actions implicate various tax and antitrust statutes, including 26 U.S.C. § 7201 *et seq.*; 18 U.S.C. § 201(c)(2); and 15 U.S.C. § 1 *et seq.*

In *Brockmeyer v. Dun & Bradstreet*, the Wisconsin Supreme Court established a narrow public policy exception to the rule of employment at-will. 113 Wis.2d 561, 335 N.W.2d 834 (1983). To prove a claim, a plaintiff must first identify a fundamental and well defined public policy and then must prove that the discharge violated that policy. *Id.* at 840–41. The burden then shifts to the employer to prove that the discharge was for just cause. *Id.* at 841. The Court further observed that

[a] wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute.

*Id.* at 840. Thus, *Brockmeyer* did not establish a general whistleblower's remedy; for the exception to apply, the employee must be fired for his *refusal* to violate the constitution or a statute. The intent is to provide relief for an employee who faces the "onerous burden of choosing between equally destructive alternatives: report and be terminated, or fail to report and be prosecuted." *Goggins v. Rogers Mem'l Hosp. Inc.*, 2004 WI App 113, ¶ 24, 274 Wis. 2d 754, 683 N.W.2d 510 (quotation omitted). An employee who acts "consistent with public policy," but who never refuses a command to violate public policy, does not have a cause of action. *See Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 396 N.W.2d 167, 170 (1986) ("[I]f the employee of his own volition acts consistently with public policy, he does no more than obey the law. Such consistent action, without an employer's command to do otherwise, is merely "praiseworthy" conduct.").

Here, Lewis has failed to offer evidence that he was directed to violate any of the statutes he identifies. Lewis's legal argument is also woefully undeveloped, as he provides no discussion of the statutes he identifies and briefly references a single case, *Strozinsky v. Sch. Dist. of Brown Deer*, 2000 WI 97, ¶ 27, 237 Wis. 2d 19, 614 N.W.2d 443. In *Strozinsky*, the Court held that federal tax policy could be considered a "fundamental and well defined" public policy for purposes of the statutes. But the plaintiff in *Strozinsky* alleged that she was terminated because she refused to falsify payroll documentation and defraud taxing authorities. *Id.* ¶ 49. Lewis has not made a similar assertion here, nor has he provided evidence that he was directed to violate any of the statutes he identifies. Lewis's claim that he was terminated for asserting he would "testify truthfully" is also foreclosed by

*Brockmeyer. See Brockmeyer*, 335 N.W.2d at 843 ("There is no clearly defined mandate of public policy against discharging an employee because his testimony may be contrary to an employer's interests."). Lewis's wrongful discharge claim therefore fails as a matter of law.


### C. Lewis's Motion for Sanctions

This is where the case stood when Lewis filed his motion for sanctions. As noted above, on June 5, 2014, after Bay's motion for summary judgment was fully briefed, Lewis filed a "Motion for FRCP 37 Sanctions and Adverse Inference." (ECF No. 68.) In support of his motion, Lewis claims that Bay destroyed or concealed electronically stored information, i.e., emails, after it received a litigation-hold notice from its own counsel on May 4, 2011, and after Lewis' attorney sent a "litigation-hold" letter two months thereafter. Based on these allegations, Lewis asks the court to sanction Bay by drawing an adverse inference against Bay so as to deny its motion for summary judgment and directing the jury to find as a fact that Bay terminated Lewis because of his statements and actions opposing sex discrimination and opposing corrupt business practices Bay. Lewis also asks that Bay be ordered to pay his legal fees caused by Bay's failure to supplement its discovery responses.

Lewis is not entitled to a sanction under Rule 37. As Bay points out, Rule 37 sanctions are available only in limited circumstances not present here. Rule 37(b)(2)(A) authorizes a court to impose a sanction on a party for disobeying a discovery order, but no discovery order was entered here. Lewis did file a motion to compel, but as noted above, he later withdrew the motion after the parties had worked out there dispute. Rule 37 also authorizes sanctions when a party fails to respond to interrogatories under Rule 33 or requests to produce under Rule 34. Fed. R. Civ. P. 37(d)(1)(A)(2). But, as explained below, Bay has responded to Lewis' discovery demands.

The dispute at the time Lewis filed his motion to compel, like Lewis' motion for sanctions, concerned Lewis' allegations that Bay had not produced all of the emails Lewis had asked for in discovery. The issue is complicated by actual wording of Lewis' request to produce. Lewis asked Bay to provide:

> With regard to Plaintiff's (then ERD-Complainant's) Document Requests Nos. 2-6 in his agency discovery requests dated April 11, 2012, a copy of which are attached as Exhibit A, please produce all responsive emails that Defendants had not produced within Defendants' responsive documents Bates-stamped BAY000001 — BAY000764.

(ECF No. 72-3 at 5.) Bay objected to the request as vague and ambiguous, and further stated that it would be as easy for Lewis to compare the two compilations as it would be for Bay and that it therefore declined to do so. Lewis had retained emails that he claimed Bay had not produced in response to his requests and thus requested a further response. In an effort to comply with Lewis' discovery demands, Bay took the extraordinary step of handing over to Lewis's computer expert a mirror image copy of the company's email server so that he could conduct his own search. It appears that in conducting the search, Lewis' expert was able to locate several non-privileged emails that Bay had not previously produced. Bay had two copies of the email server made shortly after it received the litigation-hold letter from Lewis' attorney. It retained an outside firm to create the copies and perform the searches requested by Lewis. The fact that the search conducted by Bay's outside consulting firm did not capture some of the emails located by Lewis' expert is explained by the fact Lewis' expert searched the entire server instead of the five email accounts Lewis had asked Bay to search. Lewis' expert also used a different forensic tool to conduct his search.

In any event, Lewis has failed to offer convincing evidence that Bay violated an order of the

court or intentionally destroyed or concealed evidence relevant to his claims. In fact, despite Lewis' allegations that Bay "deleted" emails, it appears that all of the previously deleted emails were recovered. While it is true that emails were deleted from one account, a copy of the same email remained available in other accounts and were ultimately recovered. In other words, the fact that an employee may have deleted an email from his inbox does not mean that the email was destroyed. As the evidence in this case demonstrates, it clearly was not. It is also uncertain whether the deletions occurred before or after counsel's litigation-hold letter.

Importantly, none of the emails retrieved by Lewis' expert provide support for his claims that his own termination was somehow in retaliation for his opposing sex discrimination in the workplace or refusing to cooperate in corrupt business practices. Most are not even relevant and others only tangentially so. Lewis seems to assume that if an email contained his key-word search terms, it was for that reason alone discoverable. But search terms are to assist in locating discoverable documents or electronically stored information (ESI); their presence does not by itself make a document relevant or discoverable. The invention of the computer did not expand the scope of discoverable information. Rule 26(b)(1) still defines the scope of discovery to include any non-privileged matter that is relevant to a party's claim or defense, or that is reasonably calculated to lead to the discovery of admissible evidence. The mere fact that an email might have Lewis' or King's name on it does not make it discoverable.

Finally, given the court's conclusion that Lewis has failed to present evidence from which a jury could find that he engaged in any protected activity, or was directed by his employer to violate a public policy, his claims fail in any event. Lewis did not need emails to prove he engaged in protected activity; if he had done so, he certainly would have known of it. Emails might be of use in establishing the true

motives of those who terminated his employment, but absent evidence that he engaged in protected activity in the first place, his demand for all of Bay's emails with his or King's name in them was little more than an expensive fishing expedition.

In sum, I do not find the Bay intentionally violated its discovery obligations or destroyed relevant evidence at a time it was obligated to preserve it in its handling of Lewis request for emails. For this reason, as well, Lewis' motion for Rule 37 sanctions and adverse inference will be denied.

## D. Evidence of Other Mueller Claim

On August 29, 2014, Lewis filed yet another motion for leave to supplement the record and cite additional authority. Lewis draws the court's attention to a recent decision from the Western District of Wisconsin in a Title VII case that has little resemblance to this case. More importantly, Lewis has attached an August 24, 2010 letter from an attorney for Bay's former human resources director requesting a severance package to settle a possible sexual harassment/hostile work place claim. Lewis notes that the failure to disclose this claim and produce the letter earlier constitutes a clear discovery violation.

While it appears the information should have been disclosed, it is difficult to see how it pertains to Lewis' claim that he was terminated for objecting to sexual harassment of Ms. King. Ms. Mueller was one of the individuals Lewis identified as harassing Ms. King. Lewis never suggested that he thought Ms. Mueller was being discriminated against or subjected to sexual harassment. In fact, Lewis was adamant that Mueller should be dismissed because she wasn't doing enough to stop the rumors or handling problems as he thought appropriate. That her attorney suggested that Mueller, not King, might have a claim of sexual harassment in connection with a letter asking for a more generous severance package has at most only tangential relevance to Lewis' claims. Given this fact, the newly produced

evidence does not prevent entry of summary judgment against Lewis on his claims against Bay.  For all of these reasons, Lewis request for Rule 37 sanctions and an adverse inference are denied.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for sanctions and adverse inference is denied, and Defendants' motion for summary judgment is granted.  Plaintiff's motion for leave to file a reply exhibit is denied.  The Clerk is directed to enter judgment in favor of Defendant dismissing all of Plaintiff's claims.

**SO ORDERED** this 30th day of September, 2014.

  /s William C. Griesbach

William C. Griesbach, Chief Judge
United States District Court